# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>TWO HARD DRIVES CONTAINING DIGITAL FORENSIC<br>IMAGES LOCATED IN WASHINGTON, D.C., UNDER<br>RULE 41 | )<br>)<br>)<br>)<br>)<br>)    Case No.    26-SW-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, hereby incorporated by reference.

located in the _____Jurisdiction_____ District of _____Columbia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§1341, 1343,<br>1349, 1956, 1957, 1519, 157 | Mail Fraud, Wire Fraud, Conspiracy, Money Laundering, Transactions<br>with Criminal Proceeds, Bankruptcy Fraud, False Statements in Bankruptcy |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Melissa Lawrence, FBI SA*

*Applicant's signature*

Special Agent Melissa Lawrence, Federal Bureau of Investigation

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:    01/08/2026

*Judge's signature*

City and state:    Washington, D.C.

Matthew J. Sharbaugh, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☑ Original        ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No.  26-SW-1
TWO HARD DRIVES CONTAINING DIGITAL )
FORENSIC IMAGES LOCATED IN WASHINGTON, )
D.C., UNDER RULE 41 )
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of _Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.


I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.



**YOU ARE COMMANDED** to execute this warrant on or before  January 22, 2026_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ❑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Matthew J. Sharbaugh, U.S. Magistrate Judge
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*    ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _01/08/2026_____

City and state:  _Washington, D.C._____            _____
                                                                                                                            *Judge's signature*

                                                                                       Matthew J. Sharbaugh, U.S. Magistrate Judge
                                                                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  26-SW-1 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

*Property to be searched*

The property to be searched consists of one Seagate 2TB hard drive, serial number, NABM6T81, and one Samsung 1TB hard drive, serial number S6SNNJ0WC01044, (the "TARGET DEVICES") containing the forensic images of specific digital devices (i.e., computers) recovered during search warrants executed on May 6, 2021. The TARGET DEVICES are currently stored at the Federal Bureau of Investigation's Washington Field Office, located in Washington, D.C., and contain forensic images of the following digital evidence items seized on May 6, 2021:

| Evidence Number | Evidence Description |
|---|---|
| 1B1 | Dell Laptop Latitude E7470 Serial #7026617054 with power cord recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B4 | Dell desktop Optiplex 990 Service tag 1N4P5R1 model #D03S recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B5 | Dell laptop Latitude 7480 Serial # 13022676650 with cable (power) recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B12 | Sony Vaio Laptop (VPCSC1AFM) S/N 275390303026393 recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B13 | One Dell Laptop with serial number BHB9KV1 recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B14 | Dell Laptop S/N 8NBKV1 recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B20 | One Dell "Optiplex 790" desktop computer "Haley" recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B21 | Computer tower i series A272A650 0072618 recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B152 | 2TB Hitachi HDD, S/N: JK1101B9H1W6WL containing forensic images of devices from Rooms: E, F, G, H, I, and L recovered from 8870 Rixlew Drive, Manassas, Virginia |

| Evidence Number | Evidence Description |
|---|---|
| 1B153 | 4 TB Western Digital HDD, S/N: WCC131NKCS7D, containing image of a 2TB internal HDD from a Dell Optiplex 990, Service Tag: D7320R1 recovered from 8870 Rixlew Drive, Manassas, Virginia |

**ATTACHMENT B**

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, , contraband, or instrumentalities, in whatever form and however stored, relating to the commission of Conspiracy to Commit Wire Fraud and Mail Fraud, in violation of 18 U.S.C. §§ 1349, 1341, and 1343; Wire Fraud, in violation of 18 U.S.C. § 1343; Mail Fraud, in violation of 18 U.S.C. § 1341; Money Laundering, in violation of 18 U.S.C. § 1956; Transactions with Criminal Proceeds, in violation of 18 U.S.C. § 1957; Bankruptcy Fraud, in violation of 18 U.S.C. § 157; and False Statements in Bankruptcy in violation of 18 U.S.C. § 1519 (the "TARGET OFFENSES") as described in the search warrant affidavit for the time period January 1, 2016, through May 6, 2021.  This includes items, information, and data more particularly described as:

     a.  Establishing or documenting the commission of the TARGET OFFENSES;

     b.  Identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

     c.  Reflecting the ownership and use of the item identified in Attachment A by the individual committing the TARGET OFFENSES;

     d.  Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

     e.  Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

     f.  Reflecting communications between the individual committing one or more of the

TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES;

h.  Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the TARGET OFFENSES;

i.  Any records and information relating to indicia of ownership of SYNERGY LAW LLC, THEMIS LAW PLLC, SYNERGY STAFFING LLC, and SYNERGY ATTORNEY SERVICES LLC ("SUBJECT COMPANIES"), including articles of organization and similar documents;

j.  Any and all records relating to the SUBJECT COMPANIES concerning the following matters:

    i.  Marketing efforts and marketing materials including phone "scripts" and similar documents used by SUBJECT COMPANIES to solicit clients;

    ii.  Services provided, or not provided, to clients of the SUBJECT COMPANIES;

    iii.  The transfer of assets and liabilities between SYNERGY LAW and THEMIS LAW;

    iv.  Business and bookkeeping records and other financial records, as follows:

        1.  General Ledgers, General Journals, all Subsidiary Ledgers and Journals;

        2.  Gross Receipts and Income records;

3. Cash Receipts and Disbursement records and/or Journals;

4. Sales and Purchase records and/or Journals;

5. Accounts Receivable and Payable Ledgers and records;

6. Cost of Goods Sold records;

7. Loan Receivable and Payable Ledgers, Registers, and

8. All Sales and Expense invoices, including invoices documenting expenses paid by cash (currency) or bank check (cashier or teller checks) or credit card and

9. retained copies of any bank checks (cashier or teller checks);

k. Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

l. Records of the movement, transfer, payment or receipt of funds, money or assets;

m. Evidence of who used, owned, or controlled the electronic devices from which the forensic images contained on the TARGET DEVICES were derived, at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

n. Evidence of software, or the lack thereof, that would allow others to control the electronic devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

o.  Evidence of the attachment to the electronic devices of other storage devices or similar containers for electronic evidence;

p.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic devices;

q.  Evidence of the times the electronic devices were used;

r.  Passwords, encryption keys, and other access devices that may be necessary to access the electronic devices;

s.  Documentation and manuals that may be necessary to access the electronic devices or to conduct a forensic examination of the electronic devices;

t.  Records of or information about Internet Protocol addresses used by the Device(s);

u.  Records of or information about the electronic devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

v.  Records regarding loans, promissory notes, notes receivable and notes payable, leases and rentals concerning the SUBJECT COMPANIES;

w.  Records and information that constitute evidence of the state of mind of MARESCA, BABBS, and other conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

x.  Indications of preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

y.  Records and information that constitute evidence concerning persons who either (i)

collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with DAVID MARESCA and/or other co-conspirators about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.    This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems,

routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF TWO HARD DRIVES CONTAINING DIGITAL DEVICE FORENSIC IMAGES, LOCATED IN WASHINGTON, D.C., UNDER RULE 41** | **26-SW-1** <br><br> <u>**UNDER SEAL**</u> |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
<u>**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**</u>

I, Special Agent Melissa Lawrence, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of two hard drives containing forensic images of digital devices seized during the execution of search warrants on May 6, 2021, (hereinafter, the "TARGET DEVICES"), as described in Attachment A, that are currently in the possession of the Federal Bureau of Investigation in Washington, D.C.  Such a search would include an examination of the seized devices for information described in Attachment B.

2.      Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

1

3.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I have drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

4.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2003.  Currently, I am assigned to a white-collar crime squad at the FBI's Washington Field Office.  During my employment with the FBI, I have conducted and/or assisted in criminal investigations involving fraud against financial institutions, private businesses, and individuals, including investigations involving wire fraud, bank fraud, conspiracy, money laundering, and other related federal violations of Title 18 of the United States Code.  I have training and experience in the enforcement of the laws of the United States, including the preparation and presentation of affidavits in support of search and seizure warrants.

5.      As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

7.      Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 157, 371, 1341, 1343, 1349, 1519, 1956, and 1957 (the "TARGET OFFENSES") have occurred. There is

also probable cause to search the TARGET DEVICES, further described in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.     The property to be searched consists of two hard drives (the "TARGET DEVICES") containing twenty-one forensic images that were extracted from physical devices seized during the execution of two Rule 41 search warrants on or about May 6, 2021, in the Eastern District of Virginia.  Those two search warrants authorized the government to search two separate locations:  (1) the home of David Maresca, *In the Matter of the Search of 13159 Lakehill Drive*, No. 1:21-sw-279 (the "Residence Warrant"); and (2) the office space used by David Maresca's business, *In the Matter of the Search of 8870 Rixlew Lane, Suites 201 and 204*, No. 1:21-sw-280 (the "Office Warrant").  A copy of the Residence Warrant is Exhibit 1 hereto.  A copy of the Office Warrant is Exhibit 2 hereto.  A copy of the Affidavit of Special Agent Robert Valdini in support of both of those warrants is Exhibit 3 hereto.  The Honorable Michael S. Nachmanoff approved the Residence Warrant and the Office Warrant on May 4, 2021.  Both the Residence Warrant and the Office Warrant authorized the seizure, extraction, and review of digital devices to include computers.

9.     When law enforcement executed the Residence Warrant on May 6, 2021, the agents recovered, among other evidence items, eight physical computers (five laptops, two desktops, and one computer tower).  Soon thereafter, those physical computers were provided to the FBI Computer Analysis Response Team ("CART") to process.  When processing devices, CART undertakes a series of steps, to include documenting the physical item, forensically imaging the item, performing an integrity check of the forensic image, processing the image to make the data readable, and generating a portable case of the raw dataset, *i.e.* an unfiltered master copy.  CART

finished processing and creating master copy forensic images for each of the eight physical devices seized during the execution of the Residence Warrant on or about August 9, 2021. The resulting forensic images, which were derived from the below digital evidence items seized on May 6, 2021, are contained on the TARGET DEVICES.

| Evidence Number | Evidence Description |
|---|---|
| 1B1 | Dell Laptop Latitude E7470 Serial #7026617054 with power cord recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B4 | Dell Desktop, Optiplex 990 Service tag 1N4P5R1 model #D03S recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B5 | Dell Laptop Latitude 7480 Serial # 13022676650 with cable (power) recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B12 | Sony Vaio Laptop (VPCSC1AFM) serial number 275390303026393 recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B13 | Dell Laptop, serial number BHB9KV1 recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B14 | Dell Laptop, serial number 8NBKV1 recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B20 | Dell Desktop, Optiplex 790 desktop computer "Haley" recovered from 13159 Lakehill Drive, Manassas, Virginia |
| 1B21 | Computer tower i series A272A650 0072618 recovered from 13159 Lakehill Drive, Manassas, Virginia[1] |

10.    When law enforcement executed the Office Warrant on May 6, 2021, CART members were present on the scene of the search and created forensic images of physical computers located at the premises. CART members created forensic copies of eleven computers. The forensic images of ten desktop computers were saved on one 2TB hard drive; the image of a

---

[1] In processing this device, CART subdivided the image of this computer into two parts with unique evidence numbers.

computer tower was saved on a separate 2TB hard drive. CART members left the physical computers at the premises and maintained custody of the two hard drives containing a total of eleven forensic images. CART members then processed those eleven forensic images in the same manner that CART processed the computers from the Residence Warrant, *i.e.*, documenting the physical item, forensically imaging the item, performing an integrity check of the forensic image, processing the image to make the data readable, and generating a portable case of the raw dataset to create a master copy. CART finished processing and creating master copy forensic images for each of the eleven forensic images seized during the execution of the Office Warrant on or about August 9, 2021. The resulting forensic images, which were derived from the below digital evidence items seized on May 6, 2021, are contained on the TARGET DEVICES.

| Evidence Number | Evidence Description |
|---|---|
| 1B152 | 2TB Hitachi HDD, S/N: JK1101B9H1W6WL containing forensic images of devices recovered from 8870 Rixlew Drive, Manassas, Virginia |
| 1B153 | 4 TB Western Digital HDD, S/N: WCC131NKCS7D, containing image of a 2TB internal HDD from a Dell Optiplex 990, Service Tag: D7320R1 (PT) recovered from 8870 Rixlew Drive, Manassas, Virginia |

11.    All twenty-one of the forensic images contained on the TARGET DEVICES are precise replicas of the original physical devices and images that were seized on May 6, 2021, pursuant to the Residence Warrant and the Office Warrant.[2]

---

[2] There were nine other devices—tablets and phones—that were also seized during the execution of these two warrants. Those devices are not part of the TARGET DEVICES at issue in this warrant.

12.     The two search warrants referenced above were issued by a magistrate judge in the Eastern District of Virginia.  Those warrants authorized law enforcement to search computers recovered from the "Office" and "Residence" for evidence related to the TARGET OFFENSES.

13.     The Office Warrant and the Residence Warrant authorized the government to search for many categories of evidence of the TARGET OFFENSES that might be located on any computers found on the premises, such as email communications, financial records, and other documentation of the TARGET OFFENSES.  As discussed further below (paragraphs 21 through 24), both of those search warrants contained a filter protocol that required a Filter Team to screen all materials recovered during the searches before providing any files to the Prosecution Team for review.  During March 2022, the Filter Team released some materials from the forensic images contained on the TARGET DEVICES (see paragraph 22 below) for review by the Prosecution Team.  In January 2025, the Filter Team released the entirety of the forensic images contained on the TARGET DEVICES to the Prosecution Team for its review.

14.     In February 2025, I began my review of the forensic images created by CART, copies of which are contained on the TARGET DEVICES, using relevance terms and date range limiters.  However, in November 2025, I realized that searches I performed in February 2025 had only been performed on the subset of documents released by the Filter Team in March 2022—not the full forensic images of the devices seized.  As a result, there are many materials on the forensic images that have not yet been reviewed by the Prosecution Team.

15.     The government now seeks the instant warrant authorizing a search of the forensic images contained on the TARGET DEVICES currently stored in the District of Columbia. The government continues to believe that it may search the TARGET DEVICES based on the authorization contained in the initial search warrants from 2021 issued in the Eastern District of

Virginia.  However, I am applying to this Court for the instant warrant out of an abundance of caution.

## PROBABLE CAUSE

16.    This investigation concerns a foreclosure rescue scheme involving DAVID MARESCA, SCOTT MARINELLI, SAM BABBS III, and other conspirators (the "conspirators"). That scheme is described in the affidavit of Special Agent Robert Valdini attached as Exhibit 3 hereto (hereinafter "the Valdini Affidavit").  The factual statements in paragraphs 6 though 49 and 57 through 79 are true and correct, and I incorporate them by reference here for purposes of the instant affidavit.

17.    In short, the conspirators operated companies—sometimes under the banner "Synergy Law LLC," "Themis Law PLLC," and "Babbs Law"—that promised to provide legal services to distressed homeowners that would help them save their homes from foreclosure.  The conspirators had victims sign retainer agreements and collected "legal fees" in the form of monthly recurring charges; they promised that attorneys would review the victims' cases; and they promised that attorneys in their "law firm" could help the homeowner, if necessary, file for bankruptcy.  In truth and in fact, the conspirators did not provide legal services as promised and used monies fraudulently received from the victim homeowners for their own personal enrichment and benefit.

18.    The Valdini Affidavit establishes that as of May 4, 2021, probable cause existed to believe that the "Residence" and the "Office" contained digital devices that stored evidence of violations of law.  (Ex. 3 ¶ 77-79.)  The forensic images contained on the TARGET DEVICES are digital copies of physical computers that were either recovered that day, or imaged on-scene, during the execution of those lawful search warrants.  Therefore, there is probable cause to believe

7

that the digital images of the previously seized physical computers contained on the TARGET DEVICES continue to contain evidence of criminal activity that occurred prior to the time when the physical devices were recovered, *i.e.*, May 6, 2021.

19.    For example, the Valdini Affidavit states that there was probable cause to believe that the physical devices recovered from the subject premises would contain "email correspondence," "text or other 'Short Message Service' messages," "records of illegal transactions, and "an accounting of illegal proceeds." (Ex. 3 ¶ 78(a).) The Valdini Affidavit also established probable cause to believe that that the physical devices would contain "forensic electronic evidence and information" related to the times where they "were used, the purpose of their use, who used them (or did not), and when." (Ex. 3 ¶ 79.) Based on my training and experience, I believe that there continues to be probable cause to believe that the forensic images of the physical devices seized and extracted during the lawful searches on May 6, 2021, (known for the purpose of this affidavit as the instant TARGET DEVICES) continue to contain these same types of evidence of the TARGET OFFENSES because the forensic images contained on the TARGET DEVICES are the same as the physical devices that were originally recovered on May 6, 2021.

20.    On April 13, 2023, a grand jury in the District of Columbia returned an indictment in *United States v. David Maresca, et al.*, No. 23-cr-123-RDM. That indictment charged MARESCA, MARINELLI, and BABBS with violations of federal law in connection with their operation of Synergy Law and Themis Law during the period 2017 through at least in or about 2022. The defendants in that matter have filed motions to suppress the evidence recovered during the execution of those warrants (ECF 133) and to permanently enjoin law enforcement from searching the physical devices and the extractions of the physical devices that were seized and

imaged during execution of the Residence Warrant and the Office Warrant. (ECF 154.)   The government has opposed those motions, and the court has yet to rule on either motion.  That case is currently set for a jury trial in March 2026.[3]

### ABSENCE OF PROTECTED MATERIALS IN THE TARGET DEVICES

21.     Although the government contends that Maresca's companies—Synergy Law and Themis Law—never provided the legal services they promised to victims, the Residence Warrant and the Office Warrant both contained filter protocols designed to prevent members of the Prosecution Team from coming into contact with materials that might be subject to claims of attorney-client privilege and work product protection ("Protected Materials").   The U.S. Attorney's Office for the District of Columbia and the FBI formed a Filter Team that was responsible for shielding the Prosecution Team from exposure to Protected Materials.

22.     During March 2022, the Filter Team provided the Prosecution Team with a subset of non-privileged materials that were identified on the forensic images of computers recovered during the execution of the Residence Warrant and the Office Warrant.   Those non-privileged materials included spreadsheets and financial records for Maresca's businesses that the warrants authorized law enforcement to seize as evidence.   The Filter Team identified those non-privileged materials by segregating files with any of seventeen file extensions.[4]

23.     On or about January 30, 2024, the Filter Team provided counsel for MARESCA, MARINELLI, and BABBS with copies of the forensic images now copied to the TARGET

---

[3] One co-defendant, Terrylle Blackstone, entered a guilty plea on or about June 6, 2024. Blackstone was sentenced by Judge Moss on October 3, 2024, to serve a period of incarceration.

[4] Those seventeen file extensions were as follows: .XL*, .XML, .CSV, .1PE, .1PF, .3ME, .TAX*, .TVL, .QB*, .ODS, .TSV, .TAB, .3PE, .DGC, .T09, .LOG, and .QWC.

DEVICES and requested that counsel identify any materials they claimed were Protected Materials on those forensic images.[5]

24.    On January 31, 2025, the Filter Team informed the Prosecution Team that counsel for MARESCA, MARINELLI, and BABBS had not identified any Protected Materials on forensic images of the computers that are now contained on the TARGET DEVICES.

25.    During February 2025, I conducted searches of the forensic images, copies of which are also contained on the TARGET DEVICES, using relevance terms and date limits.  I was able to identify documents that were within the scope of the Residence Warrant and Office Warrant.  For example, my searches of the TARGET DEVICES revealed the existence of "Intake Stats" spreadsheets containing, among other things, client names, client telephone numbers, employees who had contacted the client, and dates on which it appears the client was onboarded with the SUBJECT COMPANY.  Additionally, there were "Billing" spreadsheets containing, among other things, client names, client telephone numbers, and what appears to be client status, amount the client owed the SUBJECT COMPANY, and the date on which the payment was due.

26.    During November 2025, I learned that my searches on the FBI's review platform in February 2025 were inadvertently limited to only the materials that the Filter Team had released to the Prosecution Team in March 2022, *i.e.*, only files with one of seventeen types of file extensions.  Consequently, my searches in February 2025 did not include file types that would be

---

[5] In the *Maresca* case, Judge Moss ordered that communications between victims and Maresca's companies within the TARGET DEVICES "may only be used by the government[--] and that includes the DOJ, the U.S. Attorney's Office, and the FBI and IRS[--]for purposes of this case.  And [they] may not be used for any other purpose." (10/15/2024 Tr. 99.)  That Order applies to the search warrant requested by this application.

within the scope of both the Residence Warrant and the Office Warrant, such as MS Word files, PDFs, and email messages.

27.     The Residence Warrant and the Office Warrant authorized the search of the computers seized during the execution of those warrants for evidence of the TARGET OFFENSES.  Nonetheless, I am requesting this duplicate search warrant out of an abundance of caution.

28.     The same probable cause that existed in 2021 to seize and search the physical devices continues to exist today for the extractions of those physical devices now contained on the TARGET DEVICES.  That is, they continue to contain evidence of the TARGET OFFENSES. Your affiant submits that the probable cause to search the TARGET DEVICES has only strengthened since 2021. In the time that has elapsed since the execution of the Residence Warrant and the Office Warrant, law enforcement has interviewed additional former employees of Maresca's companies who have described the ways in which they tricked victims into paying money for legal services that the victims never received.  One of those former employees, co-defendant Terrylle Blackstone, has entered a guilty plea in Case No. 23-cr-123 to conspiracy to commit mail fraud and wire fraud.  Blackstone admitted under oath in his statement of offense "that there were no attorneys working at Synergy Law's office in Virginia and that an attorney did not review each client file as promised.  Instead, Maresca who was not an attorney, reviewed all client files[.]" (ECF 56 ¶ 6.)

**TECHNICAL TERMS**

29.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

11

a.       "Digital device," as used herein, includes the following three terms and their respective definitions:

1)       A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)       "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)       "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the

13

Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same

time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

> i.   When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

> ii.   Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

> o.   "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

> p.   "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption

algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

30.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the electronic devices from which the forensic images contained on the TARGET DEVICES were derived. Thus, the warrant applied for would authorize, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the TARGET DEVICES for at least the following reasons:

a.     Individuals who engage in criminal activity, including the TARGET OFFENSES use digital devices, like the devices from which the forensic images contained on the TARGET DEVICES were derived, to access websites to facilitate illegal activity and to

17

communicate with co-conspirators online; to store on digital devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in

free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

31.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the digital devices at issue here because:

        a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and

materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the digital devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated

with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.    A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.    I know that when an individual uses a digital device to commit fraud and other white collar offenses, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training

and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

32.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled

22

environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

      d.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as

23

searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are

many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

  f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

33. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

  i. Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICES to an appropriate law enforcement laboratory or similar facility for review. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

  ii. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include,

but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii.  In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

34.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the electronic devices from which the forensic images contained on the TARGET DEVICES were derived, contains evidence of the TARGET OFFENSES.

35.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

36.     I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICES are contained on the premises of the Federal Bureau of Investigation.

Respectfully submitted,

_____ FBI SA

Special Agent Melissa Lawrence
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 8th day of January 2026.

_____
THE HONORABLE MATTHEW J. SHARBAUGH
UNITED STATES MAGISTRATE JUDGE

27